Hugh M. Ray, III
Pillsbury Winthrop Shaw Pitman, LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Tel: (713) 276-7600
Fax: (713) 276-7673
hugh.ray@pillsburylaw.com
*Special Counsel for Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| EFO HOLDINGS, LP, | § | Case No. 12-37936-hdh-7 |
|     Debtor. | § | |

| | | |
|---|---|---|
| Scott M. Seidel, the chapter 7 Trustee, | § | |
| Joe Samuel Bailey, Laserscopic Spinal | § | |
| Centers of America, Inc., Laserscopic Spine | § | |
| Centers of America, Inc., and Laserscopic | § | |
| Medical Clinic, LLC | § | |
|     Plaintiffs | § | |
| | § | |
| vs. | § | Adversary Case No. _____ |
| | § | |
| William Esping, Peter Wilson, Robert | § | |
| Grammen, Julie Krupala, J. Hoffman & Co., | § | |
| EFO GP Interests, Inc., EFO Laser Spine | § | |
| Institute, Ltd., and the "EFO Holdings"/the | § | |
| EFO Partnership, EFO Financial Group, LLC, | § | |
| Green Series, LLC, JBJ Lending Company, | § | |
| Eminence Interests, L.P., Eminence Genpar, | § | |
| Inc.[1] | § | |
|     Defendants. | § | |
| | § | |

## TRUSTEE'S ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

---

[1] The EFO Partnership consists of the hundreds of entities operating under the EFO Holdings umbrella name, listed on Exhibit X and Exhibit Y, along with other unknown partners, all of whom are Defendants.

TO THE HONORABLE HARLIN D. HALE, U.S. BANKRUPTCY JUDGE:

COMES NOW, Scott M. Seidel, the chapter 7 Trustee (the "Trustee") for the estate (the "Estate") of EFO Holdings, L.P. (the "Debtor"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), and files this Complaint and request for injunctive relief and in support thereof would show this Court as follows:

## PRELIMINARY STATEMENT

1.    The Debtor's insiders concealed estate assets, backdated documents to transfer assets, and operated businesses impersonating the Debtor (EFO Holdings), using the EFO Partnership to defraud creditors, hide assets, and engage in illegal and wrongful conduct resulting in harm to the Estate and its creditors. The Debtor's representatives (Krupala, Esping, Grammen) transferred the Estate's concealed assets during the bankruptcy[2] (without informing the Court or the Trustee), and, among other wrongs, backdated transfer documents to over four (4) years before the bankruptcy.[3]  As outlined below, the Debtor's insiders further engaged in a conspiracy to conceal their acts by avoiding using emails and keeping documents that had no audit trial (*i.e.*, keeping over $100 million in ownership investments in entities in spreadsheets in the cloud,[4] where backdating and alterations are untraceable[5]).  The intent to avoid leaving evidence of the conspiracy is shown by Wilson's email to Esping: "EFO Proper- Who is in, who is out and how

---

[2]  *See* March 31, 2015 email chain between Julie Krupala, Robert Grammen, and William Esping, Bates EFO-DVP-002048 (Exhibit C).

[3]  *See* April 15–16, 2015 email chain where Julie Krupala intends to "take care" of the signature of a deceased individual, Bates EFO-DVP-002031 (Exhibit D).

[4]  *See* spreadsheet accounting for hundreds of millions of dollars in realized and unrealized private equity investments for 45 EFO owned entities in 2006, Bates EFO-DC-000311 (Exhibit E).

[5]  *See* Krupala Dep. 164:9–24, *Bailey v. St. Louis*, No. DC-19-10056 (Tex. Dist. Ct. Dallas Cty. May 4, 2021) (Exhibit F).

that pertains to the structure.  No specifics in an email....sorry just paranoid(and rightfully so).  I can expound in person."[6]

2.    For example, the Debtor scheduled no affiliates and Krupala testified all assets were transferred in 2007, during litigation with the Judgment Creditors.[7]  During the chapter 7 case, in March 2015, Grammen said, "It looks like the Operating Agreement shows David G. as a 20% owner and <u>EFO Holdings, LP as an 80% owner EFO Financial Group, LLC</u>.  <u>With EFO Holdings in Chapter 11 [sic], this could be a problem</u>."[8]  Krupala replied:

> <u>**Yes, that is the old, original agreement**</u>.  The tax return has not followed this. I will have to go back and do an analysis of the history but you guys had verbally made some agreements and we have used that for taxes/bonus distributions **but the legal agreement has never been amended**. Thanks, Julie[9]

3.    Grammen said to Krupala, "We should probably <u>assign EFO Holdings interests to another entity that is not in Chapter 11</u> [sic]."[10]  Krupala stated in a separate email chain that evening:

> Also, the operating agreement of EFO Financial needs to be amended to reflect this current structure.  We had discussed it before but **you guys never worked out all of the deal points**.  I have an unexecuted copy of the original regulations which are attached.[11]

4.    Instead of disclosing that the Estate owned substantial assets, Krupala apparently had Hallett & Perrin (a law firm) draft a backdated agreement (likely signed in 2015),[12] and upon

---

[6]  November 15, 2011 email from Peter Wilson to Julie Krupala and William Esping, Bates EFO-DC-000344 (<u>Exhibit G</u>).

[7]  Defined under Parties Section of Complaint ¶ 13.

[8]  <u>Exhibit C</u>, *supra* n.2 (emphasis added).

[9]  *Id*. (emphasis added).

[10]  *Id*.

[11]  March 31, 205 email from Julie Krupala to Robert Grammen and copying William Esping, Bates EFO-DVP-002049 (<u>Exhibit H</u>).

[12]  *See* Contribution and Distribution Agreement of EFO Holdings, L.P., Bates EFO-DC-001093 (<u>Exhibit I</u>) (the "Backdated Agreement").  This agreement purports to transfer the Debtor's ownership interests in EFO Financial

information and belief signed a dead man's name to unexecuted corporate formation documents. That Estate asset, in 2015 alone, paid out (during the case) $353,000 (80% of which was Estate property) to the same insiders (Esping and Grammen) based on the assets they concealed.[13]  In 2020, EFO Financial Group, LLC ("EFO Financial") filed sworn statements claiming to have access to over $246 million in "cash on hand."[14]

5.      During the case, the Debtor's representatives (Krupala and Esping) concealed numerous other assets from the Trustee and Court.  Additionally, as with EFO Financial, an insider (Krupala) transferred other assets (including intellectual property) that were omitted from the Debtor's Schedules and that were not disclosed to creditors or the Court[15] (and paid them from parallel entities, never notifying the Debtor's creditors[16] or the Trustee).  These and other assets

---

Group, LLC to Eminence Interests, L.P.  The Backdated Agreement purports to be signed in 2009 backdated to 2007, but that is still ineffective because the underlying corporate documents did not exist until 2015 and, without those, the entire transaction would be meaningless.  *See also* Exhibit F, Krupala Dep., *supra* n.5, at 98:23–100:20; 101:15–21; 105:5–16 (objection to form omitted).

Q.  Okay.  So the effect of the transaction that is at this document 7DC3E, which is Bates labeled EFO-DC-001093, the effect of the transaction was to take significantly most of the assets of EFO Holdings and give them to the partners using Eminence as an intermediary?
Q.  (By Mr. Ray)· Right?
A.  Yes.
Q.  And this actually happened is your testimony.  This actually did happen?
A.  Yes.

[13] *See* Exhibit H, *supra* n.11.
        "Let me know if this works.  BG [Grammen]
        Total Distribution       $353,000

| | | | |
|---|---|---|---|
| WPE | [Esping] | $105,000 | 29.75% |
| BG | [Grammen] | $105,000 | 29.75% |
| ███████████ | | $78,000 | 22.10% |
| | | $65,000 | 18.41% |
| Totals | | $353,000 | 100.00%" |

[14] Declaration of Renzo Renzi in Support of Motion for an Order Authorizing DIP Financing, ¶ 6, *In re 2034 Sunset Plaza Drive LLC*, No. 2:19-bk-24652-BB (Bankr. C.D. Cal. Feb. 26, 2020) (Docket # 63) (Exhibit J).

[15] *See* Krupala Aff., ¶ 12, Exhibit E to Resp. of EFO Holdings, L.P. in Opp'n to Pls.' Renewed Motion for Order to Show Cause or Alternatively for Sanctions Including an Order Disregarding Its Corporate Form, *Bailey v. St. Louis*, No. 06-08498 (Fla. 13th Cir. Ct. Nov. 2, 2020) (Exhibit K).

[16] *See* Sept. 20, 2020 email between Julie Krupala and Deborah Windham, Bates EFO-DVP-007403 ("Are you still working on getting all of the bills/invoices switched over to EFO Management's name?  I just noticed Purchase Power is still in name of EFO Holdings.") (non-breaking space symbols omitted) (Exhibit L).

were transferred to related entities in EFO Proper, owned and controlled by the Debtor's insiders,

in one instance by a loan backdated by eight (8) years.[17] Entities owned by the Debtor were not

disclosed.[18] All this while the Debtor's insiders created an accounting of assets under EFO

Holdings' management that exceeded $80 million, and at times over $100 million.[19] The Debtor's

Schedules and Statement of Financial Affairs list only $1,000 in a checking account and (upon

amendment) a malpractice claim against Haynes & Boone, but no other assets owned by the Debtor

or held by the Debtor for others.[20]

      6.     These deceptions were only recently discovered[21] through the Judgment Creditors'

efforts to collect on their judgment, and only through an adversarial process that required numerous

orders to compel (with which many are still not in compliance). As of today, the Debtor's

accountant, J. Hoffman & Co. ("Hoffman"), who operates out of the same "EFO" offices, has

refused to produce any documents, despite a court order.[22] Hoffman also apparently assisted in

---

[17] *See* November 19, 2019 emails between Klaus Milbitz and Krupala, Bates EFO-DVP-007398 (Exhibit PP). Krupala to Milbitz: "Klaus – If you are in tomorrow, please create one of these [loan entry sheet]." Milbitz response: "Julie, all done and added to folder … FYI, I booked this (these) as an AFR loan (back in 2011 when started) …"

[18] William Esping testified in December 2009 that EFO Holdings had affiliates, but the Debtor's December 2012 schedules and statements contain contrary statements do not disclose transfers of affiliates. *See* Esping Dep. 10:19–12:10, *Bailey v. St. Louis*, No. 06-08498 (Fla. 13th Cir. Ct. Dec. 2, 2009) (Exhibit M); Amended Schedule B (Docket # 42); Amended Statement of Financial Affairs (Docket # 45).

[19] *See* EFO Holdings, L.P. Assets Under Management, Bates EFO-DVP-012077, 012099, 013866, 013862, 012093, 012327, 012302, 013836, 012138, 012097, 012126, 013006, 012934, 012894, 012383, 013089, 013066, 013052, 013027, 012081, 012132, 013808, 013136, 013289, 013176, 011954, 013240, 012188, 013413, 013398, 011878, 011962, 011998, 012158, 013445, 012069 (Exhibit N).

[20] *See* Docket # 45.

[21] Discovery was not permitted during the period after trial and before the judgment's resolution on appeal – a span of seven (7) years. Moreover, as discussed herein, the Defendants took pains to conceal their actions. Only after orders compelling production were documents obtained, and even now the "white books" and other financial records have not been produced, despite court orders directed at the Judgment Debtors and their accountant, Hoffman.

[22] *See* Agreed Order Regarding Hoffman Discovery, *Bailey v. St. Louis*, No. DC-19-10056 (Tex. Dist. Ct. Dallas Cty. Mar. 25, 2021) (Exhibit O); J. Hoffman & Company's Motion for Reconsideration of Motion for Protective Order, No. DC-19-10056 (Tex. Dist. Ct. Dallas Cty. May 10, 2021) (Exhibit P); Judgment Creditors Motion for Order to Show Cause Why J. Hoffman & Co. Should Not Be Held In Contempt for Failure to Comply with the

---

the deception by reporting transactions to the IRS that were, at best, undocumented transfers of millions of dollars and, at worst, fictional. Krupala and other insiders filed false reports with the state of Texas concealing ownership,[23] and filed statements under oath claiming to own, then not own, a casino and racetrack.[24]

7.      These actions were part of an informal partnership/fraud scheme – the "EFO Proper" – that worked as a single entity to hide money from creditors, defraud the IRS and other creditors, and breach duties to the entities involved. The Estate has been injured, and the other elements of EFO Proper should be liable for the debts of the Debtor.

## JURISDICTION AND VENUE

8.      On February 5, 2021, this chapter 7 case was reopened (Docket #109). On February 8, 2021, the Trustee was reassigned.

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 542 and 543. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The Trustee consents to the entry of final orders by the Bankruptcy Court in this adversary proceeding.

## PARTIES

12.     The Trustee is the chapter 7 trustee for the estate in this case and a Plaintiff.

---

March 25, 2021 Order to Turn Over Documents, No. DC-19-10056 (Tex. Dist. Ct. Dallas Cty. May 14, 2021) (Exhibit Q).

[23] *See id.* at 107:15–108:17. *See also* Texas Franchise Tax Public Information Report for Eminence Interests, L.P. (Exhibit R).

[24] *See* Notice of Commencement dated January 2, 2019 sworn to by James O'Brien, recorded by the Brevard County, Florida clerk at Book 8342, page 2677 showing EFO Holdings as owner of Melbourne Greyhound Park (Exhibit S) and subsequent denial of ownership in Exhibit K, Krupala Aff., *supra* n.15, ¶ 6.

13.     Joe Samuel Bailey ("Bailey"), Laserscopic Spinal Centers of America, Inc. ("Laserscopic Spinal"), Laserscopic Spine Centers of America, Inc. ("Laserscopic Spine"), and Laserscopic Medical Clinic, LLC ("Laserscopic Medical") are collectively "Judgment Creditors" and co-Plaintiffs with the Trustee.  The Judgment Creditors obtained causes of action against the insiders by levy and turnover order both issued and executed on before the bankruptcy was reopened.  The causes of action that may not belong to the Trustee belong to the Judgment Creditors, who also sue in their own name, and as creditors of the insolvent EFO Debtors.[25]

14.     Defendant William P. Esping was the individual directing the affairs of the Debtor and "EFO Proper", either as managing director, officer of the general partner, or otherwise.[26]  Mr. Esping operates EFO Proper with the assistance of Krupala, who effectuates and implements the improper conduct of the EFO enterprise as outlined herein.[27]  He may be served under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to his principal place of business, 500 N. Akard St., Suite 1500, Dallas, Texas 75201.

15.     Defendant Julie Krupala, C.P.A. is a professional accountant, who carries out the regular business of the Debtor and the business of each of the EFO entities.  Krupala signed the petition and schedules under penalty of perjury on the Debtor's behalf.  She may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004(b)(1) by mailing the summons and complaint to her principal place of business, 500 N. Akard St., Suite 1500 Dallas, Texas 75201.

---

[25] Terms capitalized but not defined herein have the meaning ascribed to them in Exhibit A and Exhibit B attached. The "EFO Debtors" are EFO Holdings, L.P., EFO Laser Spine, Ltd., and EFO Genpar, Inc.

[26] Exhibit M, Esping Dep., *supra* n.18, at 28:16–24:
Q. All right. Are you the Managing Partner of EFO Holdings, L.P.?
A. I believe it has been changed to Managing Director.
Q. You are the Managing Director -- and as Managing Director what are your duties?
A. Day-to-day, pretty much, a part of the decision making on most things that we do here, on investing, other than public.

[27] The buck stops with Billy Esping, mostly.  *See* Exhibit F, Krupala Dep. *supra* n.5, at 36:13–37:4.

16.    Defendant Hoffman holds the financial information of the Debtor and is (and was) the accountant for the Debtor. The entity may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to Hoffman's principal place of business in the Dallas area, 500 N. Akard Street, Suite 1500, Dallas, Texas 75201.

17.    Defendant Robert Grammen ("Grammen") actively conspired with, but also acted to direct the actions of Krupala regarding Estate assets. He was a partner of EFO Holdings, L.P. and an affiliate.[28] He may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to him at his principal place of business, 9115 Galleria Court # 105, Naples, Florida 34109.

18.    Defendant Peter Wilson ("Wilson") worked with Esping, Grammen, and Krupala to further the interests of the EFO Partnership, and claimed to represent EFO Holdings, L.P. even after the petition date. He may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to him at his principal place of business, 500 N. Akard St., Suite 1500 Dallas, Texas 75201.

19.    Defendant EFO Holdings and EFO Proper, or the EFO Partnership will be used synonymously for the venture used by Esping, Grammen, and Krupala to engage in the fraudulent and illegal conduct as described herein. The partners of the partnership whose identities could be deduced from public information or QuickBooks files are attached as <u>Exhibit X</u> (the "500 N. Akard Partners") and <u>Exhibit Y</u> (the "Naples, Florida Partners"). The Partnership may be served with

---

[28] Esping Dep. 12:8–13, *Bailey v. St. Louis*, No. 06-08498 (Fla. 13th Cir. Ct. May 30, 2008) (<u>Exhibit T</u>):
    Q. And does Bob Grammen have relationship to EFO, as well?
    A. He was an affiliate, and as of a couple years ago, he became a partner of EFO Holdings.
    Q. So he is a partner of EFO Holdings?
    A. As of two years ago.
*See also*, August 23, 2009 email from Robert Grammen, Bates EFO-DC-001715 (<u>Exhibit U</u>) ("Robert P. Grammen Partner EFO Holdings, LP").

the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to Mr. Esping at the principal place of business of the partnership, the Esping HQ at 500 N. Akard St., Suite 1500, Dallas, Texas 75201.  In an abundance of caution, each member of the EFO Partnership on Exhibits X and Y is made a defendant herein, and may be served by serving Esping, Krupala, or any other partner, officer or director at the addresses shown on Exhibits X and Y, all of which is incorporated herein by reference.

20.      Defendant EFO GP Interests, Inc. f/k/a EFO Genpar, Inc. is a Texas corporation operated out of the Esping HQ (defined below) by Krupala and Esping to commit the fraudulent and illegal conduct described herein.  The entity may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to Krupala at the principal place of business in the Dallas area, 500 N. Akard Street, Suite 1500, Dallas, Texas 75201.

21.      Defendant EFO Laser Spine Institute, Ltd. is a Florida limited partnership operated out of the Esping HQ by Krupala and Esping to commit the fraudulent and illegal conduct described herein. The entity may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to Krupala at the principal place of business in the Dallas area, 500 N. Akard Street, Suite 1500, Dallas, Texas 75201.

22.      Defendant EFO Financial Group, LLC is a Florida LLC operated by Krupala, Grammen, and Esping to commit the fraudulent and illegal conduct described herein.  The entity may be served with the Summons and Complaint under Fed. R. Bankr. P. 7004 by mailing the summons and complaint to any officer at the principal place of business 9115 Galleria Court #105, Naples, Florida 34109.

23.      Defendant Green Series, LLC is managed by its managing member, Defendant JBJ Lending Company.  "JBJ" presumably are the initials for Jenny, Billy, and Julie, the three Esping

siblings.  Green Series, LLC's principal place of business is at Esping HQ, and it can be served by

mailing the summons and complaint to the registered agent, Scot W. O'Brien, 1445 Ross Avenue,

Suite 2400, Dallas, Texas 75202.

24.    Defendant JBJ Lending Company was and may still be the managing member of

Defendant Green Series, LLC, which is a successor/transferee from Genpar.  Its principal place of

business is at Esping HQ and can be served by mailing the summons and complaint to its registered

agent, Scot W. O'Brien, 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202.  JBJ has had Esping

and/or Krupala in actual control of the entity and was created to shuffle money to and from other

EFO entities for the improper purpose of assisting in the concealment of assets from creditors and

self-interested fiduciary transactions as described in the Green Series related transactions.  JBJ acts

as a "piggy bank" of Esping.  JBJ knew that its actions were part of a scheme to conceal assets

from the Plaintiffs in breach of fiduciary duties owed to its creditors, the Estate, and the Judgment

Debtors,[29] and it was a partner of the EFO Partnership.

25.    Defendant Eminence Interests, L.P. ("Eminence"), is a Texas limited partnership

operated out of the Esping HQ by Krupala and Esping to commit the fraudulent and illegal conduct

described herein.  Its principal place of business is at Esping HQ and can be served by mailing the

summons and complaint to the registered agent, Scot W. O'Brien, 1445 Ross Avenue, Suite 2400,

Dallas, Texas 75202.

26.    Defendant Eminence Genpar, Inc. is allegedly the general partner of Eminence,

although other records of the Debtor indicate that the general partner was (or should be) Entity

Manager, Inc.  The principal place of business for both is at Esping HQ.  Either Eminence Genpar,

---

[29] Defined in Exhibits A and B.

Inc. or Entity Manager, Inc. can be served by mailing the summons and complaint to the registered

agent, Scot W. O'Brien, 1445 Ross Avenue, Suite 2400, Dallas, Texas 75202.

## FACTUAL BACKGROUND

27.    The background of the underlying and attendant litigation is confusing and lengthy.

Rather than restate the entire dispute, the Trustee attaches the Third Amended Petition filed in

Case No. DC-20-06211 in the 162nd District Court of Dallas County, Texas (Exhibit A) and the

Second Amended Complaint filed in the 13th Circuit Court of Hillsborough County, Florida,

(Exhibit B), both incorporated herein by reference.

28.    For brevity's sake, in 2006, a lawsuit was filed in Hillsborough County, Florida,

against the Debtor, EFO Genpar, EFO LSI, and other defendants for illegal and tortious conduct

relating to the theft of a then cutting-edge minimally invasive spine business.  After years of

litigation and appeals, a final judgment was entered in favor of the Judgment Creditors– for $369

million, [30] which is currently accruing post-judgment interest (the "Bailey Litigation").  The

subsequent cases stemming from the final judgment were the first opportunity for Judgment

Creditors to seek discovery since 2009 and why this complaint could not be brought earlier.

29.    This Bankruptcy Case was conveniently filed on December 19, 2012, just two short

months after the trial judge in the Bailey Litigation issued his Non-Jury Trial Order in October of

2012, which firmly established the fraudulent conduct of the Debtor and the other defendants.

Krupala signed the voluntary petition on the Debtor's behalf.  The petition does not disclose, and

the Statement of Financial Affairs also did not disclose, that 15 days earlier Krupala and Debtor's

counsel (Pronske) filed an affiliated case of Cypress Financial Trading Company, LP (Case No.

---

[30] Second Amended Final Judgment, *Bailey v. St. Louis*, No. 06-08498 (Fla. 13th Cir. Ct. Jul. 3, 2019) (Exhibit V).

12-37723-sgj7).  Krupala also signed the Cypress Financial petition, Schedules, and Statement of Financial Affairs.

30.      According to Wilson in the year before the chapter 7 petition, Wilson, Krupala, and Esping operated "EFO Proper"[31] – the real EFO Holdings – a fact never disclosed to the Trustee. "EFO Proper" held itself out for years after the bankruptcy as EFO Holdings, used the Debtor's goodwill, email,[32] website,[33] phone,[34] and identity.[35]  The "EFO Proper" entity, according to Krupala's testimony, backdated nearly every transaction (though that practice was never disclosed to this Court or, frankly, the court or the parties in the Bailey Litigation).[36]  A "loan" was created in 2019 and backdated to 2011 (before the petition date).[37]  A 2016 proposed private placement memorandum claimed that EFO Holdings, L.P. was still working as the owner and still controlled by Esping, Grammen, Krupala, and others.[38]  In 2016, "EFO Holdings, L.P." made statements to

---

[31]  *See* Exhibit G, *supra* n6.

[32]  *See* December 8, 2018 email to Peter Wilson, William Esping, and Julie Krupala showing their continued use of the "@efoholdings" domain, Bates EFO-DVP-012062 (Exhibit W); landlord's form showing EFO Management, LLC doing business as "EFO Holdings," Bates Stream 003224 (Exhibit AA).

[33]  Current "EFO" website still uses info@efoholdings.net (Exhibit BB, at 6).

[34]  Current "EFO" website still uses the same phone number for all EFO entities.  *See id.*  *See* email from Peter Wilson using EFO Holding in signature as recent as February 22, 2018, Bates EFO-DC-011961 (Exhibit CC).

[35]  *See* July 25, 2018 email and draft promissory note between EFO Holdings and AIOTAL LLC, Bates EFO-DC-008003 (Exhibit DD).

[36]  Exhibit F, Krupala Dep., *supra* n.5, at 166:24–25 ("Every single document that we have is created after the transaction.").

[37]  *Id.* at 45:19–24.
       Q.· ·What's the business -- state the business purpose of booking a transaction in 2019 as a loan in 2011?· What is the business purpose?
       A.· ·Because there is no other relationship between those two entities other than a loan, a lender/borrower relationship.

[38]  Confidential Private Placement Memorandum TEXO LSI, LP Limited Partnership Interests April 4, 2016, Bates EFO-DVP-004443, at 5–6 (Exhibit EE):
       EFO's General Partner EFO is operated by Cypress GP, LLC, a Florida limited liability company (the "EFO GP"), which serves as the general partner of EFO.  The EFO GP is ultimately controlled by EFO Holdings, L.P., a Texas limited partnership. William P. Esping, Julie Krupala, Ballard O. Castleman, and Robert P. Gramman [sic] manage and control the operations of EFO Holdings, L.P. (emphasis added).

newspapers about its new investments in real estate.[39]  The name "EFO Holdings" has been used

by counsel on the record representing a DIP lender affiliate in 2020.[40]  The Debtor's identity is in

common use by EFO Proper.

31.    Krupala and Esping operate the intertwined businesses from the Esping HQ, where

"EFO Proper" or "EFO" is located, initially 2828 Routh Street, Suite 500, Dallas, Texas 75201,

then later 500 N. Akard Street, Suite 1500, Dallas, Texas 75201 ("Esping HQ").  Hoffman has

operated out of both addresses along with EFO Proper, and Hoffman handles the accounting for

this syndicate.

32.    At the Esping HQ, Esping and his immediate family members run an empire of

related entities.  For just one entity, the Judgment Debtor EFO GP, the Plaintiffs have uncovered

the following web of interrelated entities (not disclosed on the Statements of Financial Affairs,

schedules, or otherwise during the bankruptcy).  As is clear from the below, the Debtor is but one

of a syndicate of interrelated entities that principally have common management and control, and

their finances are housed on one QuickBooks account, with one administrator (Krupala), who

moves assets in and out of these entities without regard to corporate form or entitlement:

---

[39]  Trevor Anderson, *Apartments, retail planned for Montgomery Building*, SPARTANBURG HERALD-JOURNAL (Apr. 3, 2016, 7:20 PM), https://www.goupstate.com/article/NC/20160403/News/605138405/SJ (emphasis added) (Exhibit FF).

[40]  "MR. BERMAN: Good morning, Your Honor.  I'm sort of on the debtors' side.  Steve Berman representing **EFO Holdings**.  And seated in the gallery with me is Renzo Renzi, the proposed DIP lender, Your Honor."  Transcript of Evidentiary Hearing Re: Debtors' Motion for Entry of Order Authorizing the Debtors to Obtain Post-Petition Financing at 8, *In re The Aspen Club & Spa, LLC*, No. 19-142200-JGR (Bankr. D. Co. Jul. 2, 2019), ECF No. 192 (emphasis added).



33.    These are a fraction of the companies run at the Esping HQ, and all are part of EFO

Proper.

34.    Also, according to EFO Holdings' own financial books, on the petition date and

afterwards, the Debtor owned (but Esping and Krupala did not disclose its legal ownership of) the

following:

    a.    Between 2012 and 2016, EFO Holdings (per its own books) maintained the
        following interests in partnerships that were listed as owned:[41]

- APS Partners, LP
- Bluffview Holdings, LP
- CCA Ring Fund, LP
- Cypress GP, LLC
- EFO Financial Group, LLC

---

[41]    Krupala claims EFO Holdings' records are not correct in this respect, but she and Hoffman kept those records as
CPAs.

- EFO Laser Spine Institute
- EFO NYMEX
- Family Access Exchange, LP
- KRE/MDT2, GP
- NTE Aviation SW 23063/23251, LLC
- Opportunity Capital Genpar, LP
- Redhawk Capital Management, LP
- Rolling Sevens, LP
- RSF Genpar II
- RSF Genpar III
- Trinidad Realty Group, LP
- Waste Corp. of America, LLC

None of the QuickBooks files or other documents showing the Debtor's ownership of these entities were voluntarily produced by the control persons. This, of course, raises concerns that these facts were deliberately withheld during the bankruptcy from the Trustee.

b. According to the Debtor's records, it holds a 99% limited partnership in Cypress GP (and Genpar as its general partner). Indeed, as mentioned above, through at least 2016, the Debtor's books and records still recorded it owning the interest in Cypress GP. As of 2019, Cypress GP continued to own a 0.72% interest in EFO LSI. Based on records reviewed to date, this interest represented at least $1.2 million in distributions from EFO LSI. This ownership interest in Cypress GP was not disclosed to the Trustee nor has it identified whether Cypress GP (an entity in existence since 2001) has any other assets. No officer or control person of EFO Holdings has even acknowledged the ownership.

35. The Debtor's insiders purported to transfer ownership interests by *backdating* a document to years before the petition date, even though the assets were Estate property.[42] Esping and Krupala hired counsel for the Debtor, Hallett & Perrin, who apparently drafted the Backdated Agreement, purporting to retroactively convey the Estate's entire ownership in several entities[43]

---

[42] Exhibit I, *supra* n.12.

[43] *Id* at 8. Under the Backdated Agreement, all of the following assets were purportedly transferred to an LP, which then transferred the assets interests to the LP owners at the same moment, with no consideration to EFO Holdings except the denuded LP shares:
WCAA stock - Banc of America Investment Services, Inc. account #[redacted]
HSOA stock - Waterford Capital account #[redacted]
Cypress GP, LLC limited partnership interest

and bank accounts to insiders for zero consideration in 2007, all without informing the Court or the Trustee.[44]

36.     The Backdated Agreement was not disclosed to the Court. The Trustee did not sign it. The Backdated Agreement states it is signed in March 2009 and backdated to April 2007,[45] but the Backdated Agreement must have been signed in 2015, not March 2009, because:

    a.  The Debtor's own internal QuickBooks files in 2019 indicated it still owned some assets supposedly transferred in 2007, but Krupala simply denies those books (which she kept) are accurate;[46]

    b.  Esping testified in both May 2008 and December 2009 that EFO Holdings, L.P. owned Cypress Lending and Melbourne Greyhound Park,[47] and documents were

---

    EFO Financial Group, LLC
    EFO Laser Spine Institute Ltd. limited partnership interest
    EFO NYMEX, GP general partnership interest
    NTE SW 23063/23251, LLC member interest
    Opportunity Capital Genpar, LP limited partnership interest
    Rolling Sevens, LP limited partnership interest
    RSF Genpar II limited partnership interest
    RSF Genpar III limited partnership interest
    Waste Corporation of America, LLC member interest

[44] *Id.*

[45] *Id.* at 3.

[46] Paragraph 34, *supra.*

[47] Exhibit T, Esping Dep., *supra* n.28, at 50:5–20 (May 30, 2008):
    Q. And does -- are there other business – are there other businesses in Florida, besides Cypress Lending, that EFO owns?
    A. Yes.
    Q. What are they?
    A. One is a dog track/poker room in Melbourne, Florida.
    Q. What's the name of it?
    A. Melbourne Greyhound Track.
    Q. Anything else?
    A. LSI.
    Q. LSI standing for?
    A. Laser Spine Institute.
    Q. Do you, personally, have ownership in that or is that EFO?
    A. It's EFO.
Exhibit M, Esping Dep., *supra* n.18, at 10:21–11:5 (Dec. 2, 2009):
    Q. And does EFO also have a company that they own in Florida, Cypress Lending?
    A. Cypress Lending, yes.
    Q. Is that one of the companies affiliated with EFO Holdings?
    A. That is one in Florida.
    Q. Are there others?
    A. Well, there is LSI in Tampa, there's Melbourne in Greyhound Park in Melbourne, Florida.

filed in Florida under penalty of perjury claiming EFO Holdings, L.P. owned the racetrack,[48] but Esping and Krupala would later claim that was never the case;[49]

c. the emails sent to *generate* the Backdated Agreement were sent between Grammen, Krupala, and Esping on March 31, 2015;[50] and

d. Esping testified in 2009 and 2008 that EFO Holdings, L.P. owned Laser Spine Institute,[51] but Krupala testified it never did, and any indirect interest was transferred "in 2007".[52]

e. In addition to Mr. Esping's testimony that contradicts the backdated narrative, the Backdated Agreement purported to transfer a bank account in 2007 – but Krupala wrote checks on that same account in 2009 and 2010, then later transferred the account to Wells Fargo, and then reported it as the lone asset on the Debtor's initial Schedules, but still continued to use that account for years thereafter.

f. The Backdated Agreement also contradicts *press statements* by "EFO Holdings, L.P." from insiders working for EFO Proper at the Esping HQ (also purporting to act for Cypress Lending).[53]

---

[48] *See* Exhibit S, *supra* n.24; Notice of Commencement dated September 7, 2018, sworn to by James O'Brien, recorded by the Brevard County, Florida clerk at Book 8260, page 963 (Exhibit GG).

[49] Response of EFO Holdings, L.P. in Opposition to Plaintiffs' Renewed Motion for Order to Show Cause or Alternatively for Sanctions Including an Order Disregarding Its Corporate Form, ¶ 15, *Bailey v. St. Louis*, No. 06-08498 (Fla. 13th Cir. Ct. Nov. 2, 2020) (Exhibit HH):
> 15. Plaintiffs allege that EFO Holdings "has represented that it owned and operated Melbourne Greyhound Park" which is located in Brevard County, Florida, and which Plaintiffs claim was purchased by EFO Holdings in 2004. Motion, ¶ 5. In support of their position, Plaintiffs refer to notices of commencement of improvement to Melbourne Greyhound Park's real property, attached as exhibits to the Motion. This is false. EFO Holdings does not currently own, and has never owned, Melbourne Greyhound Park. Krupala Affidavit, ¶ 5. Nor has EFO Holdings ever operated Melbourne Greyhound Park. Krupala Affidavit, ¶ 5.

Exhibit K, Krupala Aff., *supra* n.15, ¶ 5 ("5. EFO Holdings does not currently own, and has never owned, Melbourne Greyhound Park. Nor has EFO Holdings ever operated Melbourne Greyhound Park.").

[50] Email dated March 31, 2015 "We should probably assign EFO Holdings interests to another entity that is not in Chapter 11 (if our lawyer will allow it)." Exhibit C, *supra* n.2.

[51] Exhibit T, Esping Dep., *supra* n.28, at 50:5–20 (May 30, 2008).

[52] Exhibit HH, *supra* n.49, ¶ 21:
> 21. Similarly, EFO Holdings has never held an interest in Laser Spine Institute, LLC or LSI HoldCo, LLC, though as indicated, *supra*, it did have an investment in EFO Laser Spine Institute until it transferred that investment in 2007. Krupala Affidavit, ¶ 9.

Exhibit K, Krupala Aff., *supra* n.15, ¶ 9:
> 9. EFO Holdings has never held an interest in Laser Spine Institute, LLC or LSI HoldCo, LLC, though as indicated, *supra*, it did have an investment in EFO Laser Spine Institute, Ltd. until it transferred that investment in 2007.

[53] "'We like what they are proposing,' said Brian Keuker, spokesman for **EFO Holdings**, an affiliate of the building's owner, **Cypress Lending Group**. 'We believe it is the highest and best use for the property and that

---

   g. The Backdated Agreement contradicted the EFOHoldings.com website that stated, until 2019, EFO Holdings was the owner of the site.

The contradictions in 2008 and 2009 by Esping, the Debtor's own books, the reported public statements in 2016, and the use of supposedly transferred EFO Holdings accounts by Krupala in 2009-2010 show how the 2007 "transfers" (including the Backdated Agreement) were fictional shams. Assuming *arguendo*, the Backdated Agreement was signed in 2009, the actions of these estate fiduciaries indicate they did not consider it effective.

  37. Even if the Backdated Agreement had been signed in 2009, Krupala testified that the underlying formation document for EFO Financial Group, LLC (80% owned by the Debtor) was not executed until 2015. Indeed, Larry Wallace who was supposed to have signed the formation document in 2015, had *died* in 2014 and thus upon information and belief could not have signed it in 2015. [54] Contemporaneous emails show Krupala secretly backdated the agreement to when Larry was alive. [55] To keep up the charade and avoid tipping off anyone to the backdating, Krupala did not have the signature block indicate the actual execution date or that Mr. Wallace had died. The Backdated Agreement was not signed by the personal representative of Mr. Wallace, who arguably would have had apparent authority. Krupala, eventually caught by emails, confessed that the organizational documents at the heart of the transaction were signed in 2015, <u>not</u> 2007. [56] When the issue of Mr. Wallace's missing signature on the formation document

---

these are the guys who can go and get this thing done.'" <u>Exhibit FF</u>, *supra* n.39 (emphasis added). Mr. Esping testified before the Bankruptcy filing that Mr. Keuker works for EFO Holdings. "Who manages the real estate? A. Myself [Esping], Brian Kueker, Kip Platt, which is on the Expanded Team." <u>Exhibit M</u>, Esping Dep., *supra* n.18, at 27:13–15.

[54] Email was dated April 15, 2015. Geoffrey Laurence Wallace died on February 18, 2014. https://www.ancestry.com/genealogy/records/geoffrey-laurence-wallace-24-171x149.

[55] "[B]ut the legal agreement has never been amended." <u>Exhibit C</u>, *supra* n.2.

[56] <u>Exhibit F</u>, Krupala Dep., *supra* n.5, at 101:15–102:5:
  Q. All right.· So those -- those people all signed the Articles of -- the regulations in 2015?
  A. That's what that appears to say.

---

4827-1104-6893.v9

was noted in an email to her, Krupala said she would handle obtaining the dead man's signature.[57]

Upon information and belief, Krupala signed Mr. Wallace's name, but had no legal authority to do

so.

38.     The communications between Krupala and Wilson (in Texas) and Grammen and

Horne (in Florida) to facilitate the knowing concealment of Estate assets crossed state lines and

consisted of multiple emails.[58]  On behalf of a non-Debtor EFO Proper entity, Krupala falsely

represented (during the bankruptcy case) that no entity she controlled was part of any bankruptcy

case or had not been accused of any fraudulent conduct.[59]  However, Krupala had already signed

two bankruptcy petition(s), was embroiled in a separate litigation involving fraud (Bluff Powers),

and had been sued in the Bailey Litigation and found liable in October of 2012.

39.     Both during and after the case, Esping and Krupala continued to operate EFO

Proper and generated accountings of "assets under management" of the Debtor exceeding $80

million as recently as December 2020.[60]  Despite the fact that the records were provided by EFO

---

Q.   So the only one who didn't sign in 2015 is Larry Wallace who had died in 2014?
A.   I don't know when Larry signed.· If it was after 2014, then it was his executrix.
Q.   Because this entry didn't say -- put her name down.· It says Larry's signature, right?
A.   That's correct.
Q.   That's not a forgery, right?
A.   No.
Q.   Okay.· So why do you have partially executed documents like this floating around?
A.   This was formed in 2006, and it was not fully executed.

[57] Ms. Krupala's testimony about the dead man's signature leads to even more questions. *See id.* at 101:20–21 ("I don't know when Larry signed. If it was after 2014, then it was his executrix."). There is no indication in the document that the executrix Edith Smith signed on his behalf. *See* Regulations of EFO Financial Group, LLC, Bates EFO-DC-000042, at 17, (Exhibit II). If Larry had signed when alive, then Ms. Krupala had no reason to say in her email that she would "take care of Larry's".

[58] In an April 15, 2015 email, Julie Krupala stated, "The legal documents are a mess and have been for a long time." Exhibit D, *supra* n.3.

[59] After signing both the Debtor and affiliate Cypress Lending's petitions, and while the EFO Holdings case was still open, Julie Krupala told Freddie Mac that she had never been involved (as a principal or individually) in a bankruptcy in the prior 20 years, and or a fraud suit. At the time she said this, EFO Genpar had been sued for fraud and only recently argued an appeal of the fraud judgment, and the Court had recently held hearings in the bankruptcy case. *See* Freddie Mac Borrower Certification on Mar. 17, 2015, Bates EFO-DVP-012960 (Exhibit JJ, at 3).

[60] *See* EFO Holdings, L.P. Assets Under Management as of December 31, 2020, Exhibit N, at 36, *supra* n.19.

4827-1104-6893.v9

Proper, Krupala denies that the reports show the Debtor's ownership/management, although she

was the C.P.A. in charge of generating all the reports and each monthly report for years, which

state "EFO Holdings, L.P."

40.    While litigation against EFO Holdings, L.P. and other parts of EFO Proper was

ongoing, and during the bankruptcy case, Krupala, Wilson, and Esping directed that over ten (10)

computers bought in 2009 and 2010 containing data be discarded,[61] "racks" of hard drives with

financial information be destroyed,[62] and documents migrated to new computers and the cloud.

The effect of the migration was to prevent a forensic review of the changes to the Excel

spreadsheets of ownership.[63] While the Debtor kept some financial records in QuickBooks, the

insiders of the Debtor also kept records in unofficial printed (and never produced) "white books"

(a homegrown term for a group of white binders containing the financial information) and used

other systems, including unofficial books in Excel format.[64]

---

[61] Exhibit F, Krupala Dep., *supra* n.55, at 35:5–36:11.

[62] *Id.* at 170:7–22 (objection to form omitted):
Q. (By Mr. Ray) No. You had a server in a room with the data on the hard drives. Data on the hard drives ain't there anymore, it's in the cloud. So somebody else's hard drive. So what happened to your hard drives and when did you throw them away?
A. When we moved IT services, I believe it was in 2012, maybe 2013.· I think 2013 the new provider handled the transfer of any information from -- from, I guess, the hard physical form to the cloud.
Q. (By Mr. Ray)· They didn't ghost the hard drives?
A. I'm -- I'm not certain.
Q. You don't have them today?
A. No.

[63] Exhibit F, Krupala Dep., *supra* n.5, at 164:9–24:
Q. Okay. And so is there any single repository where we could tell if these stock ledgers had ever been altered or amended or modified, or is it just on your hard drive?
A. Our documents are not saved in our hard drive.  Our documents are saved on share drives that are, I believe, hosted on a server somewhere in -- in the cloud by our IT –
Q. So, so there's no forensic analysis that could be done? If you changed a document, uploaded it, it would not -- there would be no way to see the prior version?
A. I -- I believe I understand what you're saying, and I don't think so.

[64] *See* July 9, 2019 email from EFO back-office accountant to Julie Krupala referencing "white books," Bates EFO-DVP-010618 (Exhibit MM).  *See also,* Exhibit F, Krupala Dep., *supra* n.5, at 66:16–67:19.

4827-1104-6893.v9

41.    The Backdated Agreement makes no mention of the bankruptcy proceeding though the signatories who created the document were aware of the bankruptcy.  Hallett & Perrin, a law firm, apparently drafted the document. [65]  Upon information and belief, Hallett & Perrin did so for their client, EFO Holdings.  Hallett & Perrin owe duties to the Estate.

42.    Further proving that Esping, Krupala and Grammen conspired to deceive the Bankruptcy Court, Esping testified about EFO Holdings and Cypress Lending, *before the bankruptcy*, that Cypress Lending and EFO Holdings were affiliates. [66]  Yet, in the petition for the Debtor [67] and the Statement of Financial Affairs, [68] there was no mention of the affiliate, and the schedules signed by Krupala and amended by her disclose no affiliates in the EFO Holdings case or the parallel case of Cypress Financial Trading Company. [69]

43.    For years after the bankruptcy petition, the Debtor's insiders lied about the Estate's property they had concealed, claiming the assets were transferred "in 2007" without telling the whole truth.  Krupala even falsely stated under oath in multiple court submissions in 2020 in

---

[65]  Exhibit F, Krupala Dep., *supra* n.5, at 143:16–25:
    Q. So Hallett & Perrin drafted the contribution and distribution agreement of EFO Holdings; is that correct?
    A. (Witness nods head.)
    Q. You said yes?
    A. Yes.
[66]  The following testimony in another case was not disclosed to the Trustee.  Exhibit M, Esping Dep., *supra* n.18, at 10:21–11:5:
    Q. And does EFO also have a company that they own in Florida, Cypress Lending?
    A. Cypress Lending, yes.
    Q. Is that one of the companies affiliated with EFO Holdings?
    A. That is one in Florida.
    Q. Are there others?
    A. Well, there is LSI in Tampa, there's Melbourne in Greyhound Park in Melbourne, Florida. We are large shareholders in a company called Surge Solutions.
[67]  *See* Chapter 7 Voluntary Petition filed December 19, 2012 (Docket # 1).
[68]  *See* Statement of Financial Affairs filed January 2, 2013 (Docket # 10).
[69]  *See* Schedules A, B, D–H & Summary filed January 2, 2013 (Docket # 9); Amended Schedules: B filed September 13, 2013 (Docket # 42); Statement of Financial Affairs (Amended) filed September 13, 2013 (Docket # 45).  *See also* Schedules A, B, D–H with Summary of Schedules in the voluntary chapter 7 case of affiliate Cypress Financial Trading Company (Petition # 12-37723-sgj7) (Docket # 9) (also signed by Julie Krupala).

Florida[70] and in Texas[71] that EFO Holdings had transferred assets[72] (including to Eminence Interest, L.P.) in 2007, or that they were never owned, when (at least for EFO Financial) the documents required to legally transfer ownership were still unsigned in 2015,[73] during the chapter 7 case. Eminence (and entities like it) was used as a sham and conduit to strip the Debtor of assets.[74] As a result of false statements and concealment, the Estate has lost millions in diverted distributions.

44.     Krupala admits the Debtor paid for its domain names up until the bankruptcy – it owned "EFOHoldings.com" and "EFO Holdings.net."[75] The domain names "EFOHoldings.net" and "EFOHoldings.com" were registered by Krupala as owned by EFO Holdings. When it was pointed out in the summer of 2020 that these were Estate assets, the domain registrar was told in the Fall of 2020 to change the ownership.[76] To further conceal this, the entire time Krupala used a "private" domain registration, preventing the public from seeing the actual ownership.

---

[70] Exhibit K, Krupala Aff., *supra* n.15, ¶ 8.e.

[71] Krupala Decl., ¶ 31, Exhibit A to J. Debtors' Sur-Reply to J. Creditors' Appl. for Turnover Relief and Charging Order, *Bailey v. St. Louis*, No. DC-19-10056 (Tex. Dist. Ct. Dallas Cty. Oct. 7, 2020) (Exhibit KK).

[72] The Debtor had an 80% ownership interest in EFO Financial Group, LLC. *See* Exhibit II, *supra* n.57.

[73] "At a minimum to get the bank happy, we need to have the unexecuted original agreement signed by all parties (I'll take care of Larry's) and an assignment from Goduti to Eminence Interests, LP and a new consent admitting Entity Manager, Inc. as the general partner." Exhibit D, *supra* n.3.

[74] *See* Exhibit F, Krupala Dep., *supra* n.5, at 101:15–21; 105:5–16.

[75] Exhibit HH, *supra* n.49, ¶ 23:

> 23. EFO Holdings (which, again, has no operations or assets and generates zero revenue) does not now pay, and has not paid since its bankruptcy filing, to maintain the website or domain name. Krupala Affidavit, ¶ 10. Plaintiffs assert that these are "cyber assets" that should have been disclosed in the 2012 bankruptcy. But these alleged "cyber assets" have no independent value, and have not been changed only as a matter of convenience and to avoid expense or missed communications.

> Exhibit K, Krupala Aff., *supra* n.15, ¶ 10 ("10. The website efoholdings.net and the email domain name efoholdings.com have existed for decades, but EFO Holdings does not now pay, and has not paid since its bankruptcy filing, to maintain the website or domain name.").

[76] According to the credit card statements of EFO Genpar, which was the general partner of EFO Holdings, EFO Genpar paid Godaddy.com for domain registration even before the bankruptcy, but the domain registration was refunded in part on the November 2020 account statement (Exhibit LL, at 2). This indicates the domain was transferred in October 2020 but was owned by EFO Holdings on the petition date. However, the Schedules list no intellectual property (Docket # 42).

45.    EFO Holdings is both the Debtor and an alias for "EFO Proper" under which Esping conducted all aspects of commercial and family business.   When deposed in 2009, before the chapter 7 was filed, Esping said that EFO Holdings was both an "umbrella" and "a name".[77]  The umbrella included assets that were deliberately not disclosed to this Court or the Trustee and were significant.  When the bankruptcy was filed, Krupala later would confide to Grammen in 2015 that "the legal documents are a mess,"[78] and yet she and Esping also supervised the process of destroying the hard drives, moving information to untraceable cloud-based Excel files, and engaging counsel to draft backdated documents.

46.    In keeping the books of the Debtor, Krupala and Esping use adjusting journal entries in QuickBooks to rearrange the debts and assets of each entity in "EFO Proper" or the EFO Holdings umbrella.  An accurate forensic review became hindered by Krupala compressing the files to consolidate metadata.   Krupala did not produce (and did not even disclose) the "white books" – paper copies used to cement certain parts of the Debtor's otherwise fluid accounting process.[79]  Krupala, like Hoffman, refuses to turn them over despite numerous court orders.[80]

---

[77]  Exhibit M, Esping Dep., *supra* n.18, at 16:14–25:
      Q. The -- when you went to look at this particular investment, you were looking at it for EFO
      Holdings as opposed to your own self, personally?
      A. It would fall under the EFO umbrella.
      Q. Meaning?
      A. EFO Holdings is a name.
      Q. Right.
      A. That's it. So if we would invest, had we invested, it would be under EFO Holdings.
      Q. So if a decision to invest had been made, it would have been under the EFO Holdings'
      umbrella?
      A. Under the EFO Holdings' name.

[78]  Exhibit D, *supra* n.3.

[79]  *See* Exhibit F, Krupala Dep., *supra* n.5, at 66:19–70:26.

[80]  *See* Exhibit O, Agreed Order Regarding Hoffman Discover, *supra* n.22; Exhibit Q, Judgment Creditors Motion for Order to Show Cause Why J. Hoffman & Co. Should Not Be Held In Contempt for Failure to Comply with the March 25, 2021 Order to Turn Over Documents, *supra* n.22.  *See also* Plaintiffs' Response to J. Hoffman & Co.'s Motion for Protective Order and Plaintiffs' Motion to Compel, DC-19-10056 (Tex. Dist. Ct. Dallas Cty. Oct, 16, 2020) (Exhibit NN).

47.     On information and belief, Hoffman never raised an alarm to the IRS, lenders, or any other person about what was going on with EFO Proper, the backdating and the reporting of transactions that remained undocumented or backdated by years (or that contained questionable signatures given that one signatory was deceased).  As a C.P.A. and custodian of the Estate's financial records, Hoffman had a duty to work with the Trustee, tell the truth to the Trustee, and prevent assets from being concealed.  But, as noted above, Hoffman's offices are situated *inside* the Esping HQ.  The accounting firm admits that its other clients, the non-EFO clients, are a small fraction of its work.    Thus, Hoffman's independence, objectivity, and competence was compromised by its "captured" nature.  It apparently failed to perform its job, and even appears to have assisted in the wrongdoing and the concealment of assets from the Trustee and the Debtor's creditors.

48.     Further, to facilitate the defrauding of creditors and movement of assets between companies, the Debtor allegedly was a party to a "Master Loan Agreement,"[81] which was an agreement to make loans to and from affiliates.  However, there was no disclosure of a "Master Loan Agreement" anywhere in the Debtor's Schedules or Statements of Financial Affairs or otherwise.[82]  Nor was there any disclosure in any filing (motion, declaration, or schedule) that the Debtor had allegedly borrowed money from affiliates under a Master Loan Agreement.  However, Krupala testified about a loan between EFO GP and JBJ that was made under the Master Loan

---

[81] *See* Exhibit F, Krupala Dep., *supra* n.5, at 44:4-17; 49:7-13.

[82] The Schedules did disclose a debt supposedly owed to the affiliate EFO Management (who filed no proof of claim despite notice of the bar date), but the Schedules do not disclose any loans from JBJ Lending or any other entity. The "Master Loan Agreement" is not disclosed (or discussed).

Agreement – a loan with no maturity date.[83] That loan was still on the books in November 2019 and produced to the Judgment Creditors in discovery.[84]

49.      Even though Krupala testified that the Debtor only kept books on QuickBooks, there was a second computer program – LA Pro, that was used to create "data sheets" functionally backdating affiliate loan transactions by over eight (8) years. Specifically, on November 19, 2019, shortly after receiving discovery requests from Plaintiffs, Krupala sent an email to Klaus Milbitz to make a "EFO GP to EFO Mgmt loan entry sheet."[85] Klaus replied to Krupala that he backdated the loan sheets to 2011 to appear as six (6) different loans, each with no maturity rate and the minimum applicable federal rate.[86] This backdating was an attempt to justify the transfer made by check, allegedly written on December 31, 2018, from EFO GP (the Debtor's General Partner) to EFO Management for the backdated JBJ loan of $1,389,151.23. EFO Management and JBJ Lending are both run by Krupala/Esping and accounted for by Hoffman.

50.      Because the Debtor never scheduled a "Master Loan Agreement" or disclosed one in any document filed with this Court, it is doubtful the document was ever a real agreement. If the document did exist, then Esping, Krupala and Hoffman are estopped from claiming that it bound the Debtor. It is a sham agreement. Esping, Krupala, Hoffman (and Hoffman's staff) used it to create fictional backdated loans on the LA Pro software (also never disclosed or turned over to the Trustee) to breach duties, defraud the Estate, conceal assets from the Estate's legitimate creditors, and avoid paying legitimately owed taxes to the IRS.

---

[83] Exhibit F, Krupala Dep., *supra* n.5, at 49:9-50:17.

[84] Exhibit F, Krupala Dep., *supra* n.5, at 49:17-50:22.

[85] Exhibit PP, *supra* n.18..

[86] *Id.* "Julie, all done and added to folder ... FYI, I booked this (these) as an AFR loan (back in 2011 when started), and is thus actually comprised of 6 separate loans (i.e. 6 data sheets and 6 LA Pro rprts), but all contained in the one PDF."

51.    The Trustee learned of information recently and moved to reopen the case on December 28, 2020.

## CAUSES OF ACTION

### A.    Breach of Fiduciary Duty and Theft

52.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

53.    Krupala and Esping owed fiduciary duties to the Estate.  Grammen also owed fiduciaries to the Estate because of his close confidential relationship with the EFO Proper enterprise.  Grammen was closely involved with Esping and the person who was a trusted affiliate of EFO Holdings.

54.    The other key members of EFO Proper, Wilson and Hoffman, owed duties to the Estate because of their close confidential relationship and position of trust.   For example, in refusing to turn over financial information in her possession about other members of the EFO Partnership, Krupala testified that she has an unwritten agreement to keep information confidential between the members of the enterprise.[87]  Krupala had signatory authority over the Debtor's accounts and thus was, at a minimum, a fiduciary for the Debtor's funds she controlled.

---

[87] Exhibit F, Krupala Dep., *supra* n.5, at 119:1–10.
    A.  There's no written agreement.
    Q.  And what obligation do you have as -- I assume you represent EFO Management, also?
    A.  Yes.· I'm the CFO.
    Q.  Okay.· So what obligation does EFO Management have to keep EFO Genpar's records confidential, if any?
    A.  I believe it has a duty to keep all of the records that are managed confidential.
    Q.  There's no agreement, right?
    A.  There's no written agreement.

55.    As control persons of an insolvent entity, Esping and Krupala owed fiduciary duties to the creditors of the Judgment Debtors, including creditors of EFO Holdings, EFO Genpar, and EFO LSI, to avoid harming the creditors of those debtors.

56.    Krupala and Esping breached their duties by engaging in the acts described above (and on Exhibits A and B). They concealed assets, misused Estate property, lied about possessing bankruptcy assets and then, when confronted, continued to transfer and conceal those assets.

57.    The Estate has lost millions of dollars in diverted distributions, missing business opportunities, goodwill, and the recovery and potential liquidation of numerous valuable assets. That loss injured the Plaintiffs and the Estate. Because Krupala and Esping repeatedly altered the Debtor's books and destroyed forensic evidence, the Estate cannot reasonably un-intertwine assets of EFO Holdings and those of EFO Proper, if a separation ever existed.

**B.    Turnover of Estate Property**

58.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

59.    Esping, Krupala, Grammen, and Wilson are insiders and fiduciaries.

60.    EFO Proper and its insiders are asserting control over Estate property.

61.    The LA Pro software used to generate the backdated loans and the information it contains is property of the Estate.

62.    The QuickBooks software and the information it contains is property of the Estate.

63.    The "white books" are records of financial activity involving the Estate and Estate property.

64.    The accounting records held by Hoffman are Estate property.

65.     The assets reflected on Krupala's internal reports for "EFO Holdings, L.P. Assets Under Management" are (and have always been) property of the Estate.

66.     All claims of the Debtor that have a nexus with prepetition activity, including claims against the Krupala, Esping, alter-egos of the Debtor, former and present accountants, and even a legal malpractice cause of action against Holland & Knight, Estate counsel, are property of the Estate.

67.     All of the "EFO Proper" assets are property of the Estate.  The actions of Krupala, Esping, Grammen, Hoffman, and Wilson worked to conceal the Estate's interest in the property, diverting it to other members of the partnership.  Esping and Grammen assisted Krupala in lying about, then falsifying documents to conceal the Estate's true ownership.  Hoffman disobeyed court orders and worked with Krupala to assist in the concealment of assets.

68.     The Estate assets, including those of EFO Proper, and of Esping, Grammen, Wilson, Hoffman, and Krupala should be turned over to the Trustee and administered by the Trustee to pay the creditors of the Estate.

## C.      Alter-Ego

69.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

70.     Disregarding the corporate forms to pierce the corporate veil and impose liability directly on wrongdoers and their agents is not a cause of action itself, but a means of expanding the resources available for recovery, which may be brought after recovery of a judgment in the original, underlying action. *Gallagher v. Bintliff*, 740 S.W.2d 118, 119 (Tex. App.—Austin 1987, writ denied).  As such, any statute of limitations against Defendants was tolled by the action against the EFO Debtors, until the judgment against the EFO Debtors became final on July 3, 2019.

*Matthews Constr. Co., Inc. v. Rosen*, 796 S.W.2d 692, 692-94 (Tex. 1990) ("[I]f we were to apply limitations under these circumstances, it would effectively permit the corporate form to be used as a 'cloak for fraud.' . . . . We will not permit the law to be used for unlawful ends." *Id.* at 694.)

71.     As set forth on Exhibit A, the Third Amended Petition, in paragraphs 165-191, incorporated by reference, this Court should disregard the corporate shells of the entities on Exhibits X and Y.  In equity, this Court may disregard the separate corporate existence of each of the entities operated by Esping and Krupala at the Esping HQ, regardless of form, state of incorporation, or titular purpose because they are being used as a cloak for fraud and unlawful ends.

**D.     In the Alternative, 11 U.S.C. §549 (by the Trustee)**

72.     The Trustee and Judgment Creditors repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

73.     The alleged "transfers" of estate property (described above) but documented, in whole or in part, after the bankruptcy were not effective transfers by the owner of the asset.  In the alternative, if transfer of ownership of any Estate asset was effective, the transfer was not authorized by this Court or the Bankruptcy Code.

74.     The transfers were concealed by Esping, Krupala, and Hoffman who each had a duty to disclose their actions and correct their omissions and mis-statements on the Debtor's Schedules, Statements of Financial Affairs and otherwise.  The alleged transfers of interests, especially those allegedly made to Eminence, were further concealed by the alteration of documents, the post-bankruptcy creation of documents, and the post-bankruptcy creation of fictional pre-bankruptcy loans with affiliates.

75.     Because of the misdeeds of Esping, Krupala, and other insiders of the Debtor (including Hoffman), any statute of limitations is tolled until the Trustee's reasonable discovery, and the Trustee could not reasonably have discovered the supposed transfer until only recently (October 2019 at the earliest), applicable statutes of limitations are tolled, and the Trustee may timely sue to avoid the transfers under 11 U.S.C. §549 and 550.

76.     The Trustee sues to avoid the alleged post-2012 transfers from the Debtor of unscheduled assets under 11 U.S.C. §549 and 550 and recover the assets or their value for the Estate.  If the Trustee does not own the causes of action, then the Judgment Creditors do, and they bring this cause of action for the Estate.[88]

## E.     Accounting

77.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

78.     A fiduciary is required to keep separate property in her charge and account for it. Krupala, Hoffman, Esping, Wilson, and Grammen were fiduciaries of the Debtor.

79.     While it is likely that the assets and liabilities of the EFO Proper entities are so inextricably intertwined that they cannot be separated (certainly not without extraordinary time and expense), the Estate is entitled to a fulsome understanding of EFO Proper and the assets in the "umbrella" (to use Esping's words).

---

[88] Any purported abandonment of the Estate's chapter 5 causes of action would not apply to these claims, as they were not disclosed to the Trustee and the information provided was incomplete or inaccurate.  Similarly, some of the chapter 5 causes of action could not have been abandoned as the cause of action was not in existence at the time of abandonment (*i.e.*, the 2020 transfer of domain names or backdating of loans in 2019 to 2011).  If properly abandoned, the cause of action was obtained by Judgment Creditors when they (1) levied on all causes of action of EFO Holdings, L.P. and purchased them at a constable's sale and (2) obtained a turnover order to turnover all causes of action of EFO Holdings, L.P.  The settlement agreement between Judgment Creditors and the Estate remedies any standing issues for the Estate.

80.     The financial information of all members of EFO Proper is necessary to determine the assets of the Estate and the information should be turned over.   The Court should enter injunctive relief requiring that (at their own expense) Hoffman, Krupala, Esping, Wilson, Grammen and those in active concert with them or entities under their control account for:

      a.   all property currently or formerly held by EFO Holdings,

      b.   all assets listed on the regular reports showing assets "managed by" EFO Holdings,

      c.   all assets of EFO Proper since 2005, and

      d.   provide the information within forty-five (45) days of the Court's order or judgment.

## F.   Alternative Claim for Fraudulent Transfer, Quantum Meruit, and Unjust Enrichment

81.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

82.     The claims in <u>Exhibit A</u> and <u>Exhibit B</u> are realleged in the alternative as claims that, if the corporate separateness of the EFO Proper entities were maintained, the entities took property not belonging to them (subject to disgorgement), the transfers were actually and constructively fraudulent to creditors, were made in breach of duty to creditors and the entities themselves, were part of a conspiracy to breach fiduciary duties, and resulted in unjust enrichment at the expense of the Judgment Creditors and Trustee.   Additionally, in the alternative, the Judgment Creditors allege the disgorgement judgment provides them equitable ownership of assets based upon the underlying fraud by Esping and the Judgment Debtors.

G.      **Misrepresentation, Impersonation and Estoppel**

83.      Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs of the Complaint (including, as set forth above, <u>Exhibits A and B</u>) as if fully set forth herein.

84.      Persons acting at EFO Holdings' address represented themselves as EFO Holdings, sought corporate opportunities as EFO Holdings, referenced that EFO Holdings was involved in real estate, casinos, racetracks, and lending, as set forth herein.  Whether it was Mr. Esping using the EFO Holdings "umbrella" and representing himself as EFO Holdings, Mr. Wilson soliciting a loan transaction under that name, James O'Brien filing sworn documents, or Krupala and Grammen signing everyday documents as EFO Holdings, these insiders have impersonated the Debtor.  Krupala admits to filing documents acting for the Debtor post-bankruptcy, and the EFO Partnership used the name EFO Holdings in dealing with creditors and the public at large.

85.      In equity, the person who impersonates a Debtor ought to be liable with the Debtor and estopped from denying liability for the Debtor's debts.  Krupala, Wilson, Esping, and Grammen held themselves out to act for an entity that they would later claim had liquidated and not operated since the bankruptcy.  Krupala, Esping, Grammen, and Wilson were all aware of the bankruptcy, aware that they did not represent the Debtor, but claimed to be representatives of "EFO Holdings."  In operating as "EFO Holdings", in conjunction with other partners of the EFO Partnership, they are estopped from denying that those using the alias of the Debtor owe the Debtor's debts.

## REQUEST FOR INJUNCTIVE RELIEF

86.      Plaintiffs seek a temporary restraining order, a preliminary injunction, and ultimately a permanent injunction preventing the Defendants and those in active concert with them

from further altering books, destroying financial records, or concealing or transferring assets of EFO Proper.

87.     The Fifth Circuit utilizes the traditional four-part standard for determining whether a bankruptcy court should issue an injunction:

      (i)     a substantial likelihood that the movant will prevail on the merits;

      (ii)    a substantial threat that the movant will suffer irreparable injury if the injunction is not granted;

      (iii)   that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and

      (iv)    that the granting of the injunction will not disserve the public interest.

*Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 765 (5th Cir. 1995).

88.     The Plaintiffs meet all four standards.

89.     *First*, there is a substantial likelihood that the Plaintiffs will prevail on the merits. That Estate assets and financial information was not properly disclosed is proven by Krupala herself.  For example, several assets (*i.e.*, domain names of efoholdings.com and ownership interests in other assets entities) were not scheduled and records were not disclosed that were later altered retroactively.  A key issue for breach of duty is whether Esping, Wilson, Grammen, Hoffman, and/or Krupala's actions were all innocent mistakes (or not).  For example, transferring the domain registrar in October 2020, after being contacted by the Trustee, shows consciousness of guilt.  The same consciousness of guilt is shown by the emails between Esping, Grammen, and Krupala indicating that the "legal documents are a mess", that transfers needed to be written down to codify years-old "oral" understandings, and that Grammen was concerned about doing the transaction during the "chapter 11" [sic] bankruptcy.  On the whole, it is likely the Trustee will prevail on some of his claims relating to the keeping of records and transfers of assets.

90.    *Second*, there is a substantial threat that the Estate will suffer irreparable injury if the injunction is not granted.  Losing financial records is irreparable.  Krupala and Esping gave no notice to the Trustee in 2013 when they were destroying hard drives and computers.  Hoffman has disobeyed orders to produce financial documents and continues to do so, even after demand from the Estate.  Thus, there is irreparable harm if any more records are altered or destroyed, especially the "white books" that have not been produced.

91.    An agreed injunction was issued in Judge Slaughter's court in Dallas County.[89] But, even after the injunction, EFO Genpar's credit card was used for EFO Proper without notice to the Judgment Creditors.  Turnover orders were issued by Judge Moore, also in Dallas County, and contempt proceedings were commenced there.   Contempt proceedings have been brought against Esping and Krupala in the Florida Court.  As the pattern of transferring assets shows, the relief cannot be cured by mere monetary awards.  For example, the Green Series transfer from Genpar in 2019 of an interest in an asset worth over $104 million on the Austin County records shows that when the concealment is made, it leaves nothing left for the creditors.  Similarly, the transfers from the Backdated Agreement left the Debtor a shell, if the transfers ever happened. The only way to prevent further harm is to prevent further transfers.

92.    The previous injunctions and orders were not obeyed, but this Court's orders carry more grave consequences.

93.    *Third*, the threatened injury to the Estate outweighs any threatened harm an injunction may cause the Defendants.  The Defendants suffer no harm from being forced to cease altering and destroying records.  Similarly, Judge Slaughter's injunction prohibited certain

---

[89] Order for Agreed Injunction, *Bailey v. St. Louis*, No. DC-19-10056 (Tex. Dist. Ct. Dallas Cty. May 4, 2021) (Exhibit OO).

4827-1104-6893.v9

disposition of assets, which means there is already some limitation on the transfer of assets. The incremental inconvenience is minimal. Conversely, the harm to the Estate and Plaintiffs from continued destruction, transfer, and alteration is considerable. The Defendants are modestly inconvenienced by being restricted from transferring assets without first obtaining permission of the Trustee, but they can seek permission if the Trustee does not consent to a legitimate transfer. In many ways, the Automatic Stay already limits Defendants' transfer of property and destruction/alteration of financial records.

94.     *Finally*, public interest favors issuance of the injunction. The Trustee seeks an injunction preventing the Defendants (and those in active concert with them) from destroying and altering records or moving or concealing assets (unless the Trustee consents). The injunction will therefore protect the integrity of these bankruptcy proceedings. *Cf.* 11 U.S.C. § 105(a) (bankruptcy court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process"). The injunction largely mirrors the injunction issued by Judge Slaughter in the Dallas State Court.

95.     In accordance with Fed. R. Bankr. P. 7065, the Trustee requests that no bond be required in connection with the issuance of the requested preliminary injunction. *See Kaepa, Inc. v. Achilles Corp.*, 76 F. 3d 624, 628 (5th Cir. 1996) (court has discretion to require no security under Fed. R. Civ. P. 65(c)). The Trustee seeks an injunction simply to prevent further concealment and transfers of assets or alteration of records. The relief is based substantially on the *in rem* jurisdiction of this Court, and so it is proper for the court to require that whoever is in possession of Estate records and Estate property cease destroying records or moving property of EFO Proper without notice or approval of the Trustee or this Court.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that the Court enter an order:

(i)     granting judgment in favor of the Trustee;

(ii)    granting a preliminary injunction, and (ultimately) a permanent injunction against the Estate's fiduciaries and those in active concert with them to prohibit destruction or alteration of records and/or transfers of assets of EFO Proper without Trustee consent or the Court's approval;

(iii)   requiring an accounting by the Estate fiduciaries;

(iv)    compelling turnover of property of the Estate;

(v)     declaring that Defendants are the alter ego of the Estate and liable for claims and indebtedness owed by the Estate;

(vi)    awarding monetary damages against the Estate fiduciaries (Krupala, Grammen, Esping, Wilson, Hoffman) for breach of fiduciary duty, including punitive damages, exemplary damages, interest, attorney's fees as provided by law and the contracts engaging the fiduciaries, and all costs; and/or

(vii)   in the alternative, compelling return of property transferred from the Estate and awarding monetary damages as set forth on Exhibits A and B; and

(viii)  granting such other and further relief as is just, proper, and equitable.

Dated: July 2, 2021

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:        _/s/ Hugh M. Ray, III_
           Hugh M. Ray, III
           State Bar No. 24004246
           Two Houston Center
           909 Fannin, Suite 2000
           Houston, TX 77010-1028
           Tel: (713) 276-7600
           Fax: (713) 276-7673
           hugh.ray@pillsburylaw.com
           baileycollections@pillsburylaw.com

**_Special Counsel for the Trustee_**